145 P.3d 845

**Ernest J. SASAKI and Katherine K. Sasaki, Plaintiffs–Appellees,**

v.

**Georgialynn MORISAKO and Kevin Santana, Sr.,[1] Defendants–Appellants.**

**No. 27644.**

Intermediate Court of Appeals of Hawai'i.

Sept. 14, 2006.

Georgialynn Morisako and Kevin Santana, Sr., on the briefs, defendants-appellants, pro se.

Diana L. Van De Car, on the brief, for plaintiffs-appellees.

1. While many of the documents filed in the record on appeal refer to one of the Defendants–Appellants as "Kevin Santana, Jr. (sic)[,]" documents filed by him are signed as "Kevin Santana, Sr." For purposes of this opinion, we will refer to him as "Kevin Santana, Sr."

WATANABE, Presiding J., NAKAMURA, and FUJISE, JJ.

Opinion of the Court by WATANABE, Presiding J.

This appeal by Defendants–Appellants Georgialynn Morisako (Morisako or Miss Morisako) and Kevin Santana, Sr. (Santana or Mr. Santana) (collectively, Appellants) stems from a complaint filed by Plaintiffs–Appellees Ernest J. Sasaki (Ernest) and Katherine K. Sasaki (Katherine) (collectively, the Sasakis) against Appellants and Sterling Ogata (Ogata or Mr. Ogata) (collectively, Defendants), seeking: (1) summary possession of the property that the Sasakis had rented to Ogata, but which Ogata had vacated and allowed Appellants to occupy; and (2) a monetary award for unpaid rent and damages to the property.

The complaint was served on Appellants, but not on Ogata, and Appellants' defense during the proceedings below was that Ogata, not Appellants, was responsible for the damages to the property for which the Sasakis sought restitution.

On August 9, 2004, the District Court of the Third Circuit, North and South Hilo Division[2] (the district court) entered a judgment for possession that granted the Sasakis' request for summary possession of the property and issued a writ of possession against Defendants. On November 10, 2005, the district court entered an amended judgment that awarded the Sasakis $11,647.48[3] in damages against Appellants only. The amended judgment indicated that the district court had dismissed the complaint against Ogata on January 25, 2005.[4] This appeal from the amended judgment awarding the Sasakis damages against Appellants, entered on November 10, 2005, followed.

We reverse the amended judgment in part and affirm the amended judgment in part.

## BACKGROUND

The Sasakis own a two-story house on property in Hilo, Hawai'i (the property) and rented the second floor of the house to Ogata pursuant to a written rental agreement.[5] Sometime in early May 2004, Ernest went to the property to do some work on the first floor of the house and went upstairs to speak to Ogata about an engine that had been left in the yard. Morisako, who "share[s] children" with Ogata,[6] her ex-boyfriend, appeared at the door and informed Ernest that Ogata "was not here anymore." Ernest testified that he "got kind of upset" that Ogata, who had paid the rent through the end of May 2004, had left the property without informing Ernest. However, according to Ernest,

> [Appellants] told me, "Mr. Sasaki, no worry, we like this house, we go stay in this house and we go take care and we go pay for the month. For that month." And I say, "Okay, you guys pay for the month

---

2. The Honorable Barbara T. Takase (Judge Takase) presided.

3. The amended judgment, entered on November 10, 2005, awarded Plaintiffs–Appellees Ernest J. Sasaki (Ernest) and Katherine K. Sasaki (collectively, the Sasakis) the following amounts against Defendants–Appellants Georgialynn Morisako (Morisako) and Kevin Santana, Sr.:

| | |
|---|---|
| Prinicipal Amount | $10,513.08 |
| Attorney's Fees | $   764.04 |
| Costs of Court | $   130.00 |
| Sheriff's Fees | $   220.00 |
| Sheriff's Mileage | $     20.00 |
| | |
| Total Judgment Amount | $11,647.48 * |

\* The sum of the individual amounts does not equal this total judgment amount.

4. The dismissal order entered on January 25, 2005 is not included in the record on appeal.

5. During the proceedings below, Ernest testified that he did not know where the rental agreement was or how long Defendant Sterling Ogata (Ogata) had been renting the property.

6. Morisako testified that Ogata was her "exboyfriend" and they had children together. According to Morisako, Ogata lived in the Sasakis' house with their children, and on a particular Saturday in May 2004, Ogata told her "that he was going to move out of the home," and he asked her if she "wanted to stay there that weekend with the kids." On the Saturday that she moved into the home, Morisako explained, "[w]e weren't even talking about moving in yet." However, when she saw Ernest the following Monday, she informed him that Ogata "was going to move out" and spoke to Ernest "about moving into the home." Morisako further testified that Ernest said "Oh, okay."

and then in the time being I going give you guys one application. You guys fill up the application and from there we going see how things work out."

Appellants paid and Ernest accepted the amount of $1,200.00 for rent for the month of June 2004. After receiving the rental application from Appellants, however, the Sasakis decided that Appellants "weren't qualified to stay in the house" and apparently notified Appellants that the rental agreement was being terminated.

On July 8, 2004, the Sasakis sent a demand and notice letter to Appellants, notifying Appellants, in relevant part, as follows:

In accordance with the Hawaii State Landlord–Tenant Code, Section 521–68, demand is hereby made for payment of the sum of $1,200.00 for rent due for July, 2004. You are already late with this payment, and you are hereby noticed that unless payment in full is made on or before the close of business on Thursday, July 15, 2004, the rental agreement shall be terminated at that time.

In the event you have not paid the rent by July 15, 2004, we may bring a summary proceding [ (sic) ] for possession of the dwelling unit or any other proper proceeding, action, or suit for possession and may also bring an action to recover all sums due and owing us in accordance with the laws of the State of Hawaii and the rental agreement, including court costs and attorney's fees.

This demand and notice is in addition to, not in place of the July 2, 2004 Notice of Termination of Rental Agreement.

The July 2, 2004 notice of termination of rental agreement is not in the record on appeal.

On July 19, 2004, the Sasakis filed the complaint against Defendants that underlies this appeal. The complaint, which was typed on a pre-printed district court form, alleged, in relevant part, as follows: (1) the Sasakis are the landlord of the property; (2) "[t]here is no written rental agreement for the property, only an oral agreement"; and (3) Defendants had "broken the rental agreement" because they owed the Sasakis $1,200.00 for unpaid rent for the month of July 2004, plus an unknown amount for damages to the property and holdover rent. The complaint sought: (1) a judgment giving the Sasakis possession of the property, (2) a writ of possession directing the sheriff or police officer to remove Defendants and all their personal belongings from the property and put the Sasakis in possession of the property, and (3) a judgment for damages.

At the August 3, 2004 hearing on the Sasakis' summary possession request, Appellants entered general denials. On August 4, 2004, the district court[7] entered an order that: (1) established a rent trust fund for the purpose of holding disputed rents as such sums became due, pending resolution of the case or further order of the district court; (2) required Defendants to deposit into the rent trust fund on or before 4 p.m. on Friday, August 6, 2004, rent for the months of July and August 2004, totaling $2,400.00; and (3) directed that if Defendants failed to make any rent payment into the rent trust fund as such payment became due, the Sasakis "shall have an immediate judgment for possession, and a writ of possession shall issue to the sheriff or to a police officer of this Circuit, commanding the sheriff or police officer to remove all persons from the [property] and to put [the Sasakis] into full possession thereof."

On August 9, 2004, the district court entered a judgment for possession and issued a writ of possession for the property. By a return of service filed on August 18, 2004, civil deputy Robert K. Kualii (Kualii) certified that he had executed the writ of possession by posting the writ and the judgment for possession upon the property at 4:15 p.m. on August 12, 2004. Kualii also certified as follows:

Subsequently, on 8–13–04, 12:10 PM. [ (sic) ], an inspection of the confines of the dwelling was conducted in the presence of the [Sasakis]. It was established that [Appellants] had infact [ (sic) ] vacated the residence as evidenced by it's [ (sic) ] confines being free of any personal effects belong-

7. Judge Takase presided.

ing to them. Although a dining set, to include a table and four (4) chairs, remained within the garage area and a vehicle engine was present in the back yard. The [Sasakis] expressed disatisfaction [ (sic) ] with regards to the dwelling not being preperly [ (sic) ] cleaned as debris remained on the floor and dust on the glass louvers and within the kitchen drawers. There were stains to sections of the wooden and tile floors and damages to the walls within the hallway and bathroom. Both bathroom tubs possessed meldew [ (sic) ] and it's [ (sic) ] sliding doors were off track. There were damages to the bedroom ceiling as a result of tacks being embedded into same. Stains were also present on the walls and ceiling of the master bedroom. Several of the blinds to windows and it's [ (sic) ] screens were damaged. The hallway door was damaged and there were stains to the stairway carpet leading to the lower section of the home. Sliding doors to the bedroom closets were either off track or removed. A picture positioned on the wall of the master bedroom bathroom and remote control devices governing the living room lights and fans were missing. A video recording documenting these points of interest were taken by [Ernest].

On August 31, 2004, the district court[8] held a proof hearing on the Sasakis' claim for damages. Ernest and Katherine both testified about the damages to the property that they had identified after Appellants vacated the property. Ernest also explained and authenticated various exhibits (e.g., an inventory prepared by the Sasakis of the condition of various items in the house after Appellants had vacated the property, photographs, and estimates and proposals for repair work) that were introduced into evidence by the Sasakis to document their damages and their costs to repair the damages. Based on these exhibits, the Sasakis requested $10,201.00 in damages from Appellants.

At the hearing, Appellants did not dispute that the property was damaged. Indeed, Morisako expressly informed the district court, "I'm not disputing the damages because it is there." However, Appellants insisted that: (1) they did not cause the damages, (2) Ogata was responsible for the damages, and (3) the damages for which the Sasakis were seeking restitution were "already there before we even started to actually live there." During Santana's cross-examination of Ernest, the following colloquy occurred:

Q. . . . How can you be sure that [Morisako] and I did all this [ (sic) ] damages here?

A. Well I would assume because you folks was the last to leave.

Q. You're assuming that because we were the last one to leave?

A. I would say between you and [Ogata].

During Morisako's cross-examination of Katherine, Katherine admitted that she had "[n]ot completely" conducted a "walkthrough . . . of the house" with Morisako to evaluate the condition of the house following Ogata's departure. Evidence was also adduced that on May 10, 2004, after Appellants had moved onto the property, Ernest walked through and surveyed the second floor of the house with Morisako. No written inventory of any damages identified during such walkthrough was documented and presented at the proof hearing. According to Morisako, however:

[Ernest] came upstairs, he saw every room. We talked about the smoke detectors. He said, "Oh, yeah, that got to go back up." I said, "Yeah, because I didn't take it down."

He saw the damages to the closet, he saw all the damages that is in the evidence was already there before we even started to actually live there.

The testimony at the proof hearing also indicated that on July 2, 2004, the Sasakis showed up at the house for an inspection and walk-through, after giving Appellants "15–minute [ (sic) ] notice."[9] Santana testified that

---

8. Judge Takase presided.

9. Hawaii Revised Statutes (HRS) § 521–53 (1993) provides as follows:

one of the days they came through and they wen walk through the house. The day that they come inside and walk through the house it was totally unexpected.

. . . .

You're supposed to give notice. One landlord supposed to give their tenant notice. We had 15–minute notice.

On that day we had all our kids, it was a summertime, and the house was clean considering. So [Katherine] comes walking through the house real sarcastic, talking a whole bunch of trash, just irritating the whole situation.

Santana stated that as a result of the lack of advance notice, he refused to sign the written inventory of the house that was prepared by Katherine following that walk-through, and the inventory was not offered into evidence at the hearing.

In orally ruling in favor of the Sasakis, the district court held:

THE COURT: Alright [ (sic) ]. With regard to the damages the Court is going to find as follows: that there was a verbal agreement between Mr. Santana, Miss Morisako, and the Sasakis to rent their property. They took over the property that was being rented by Sterling Ogata without the landlord's initial knowledge.

I am going to find damages as follows: $75 to the screen door, $12.08 for the receipts for the developing of the pictures, $1900 for the estimate for repairing bathroom doors, bedroom doors, kitchen cabinet estimates from the contractor.

With regard to the painting, the estimate is for $3,420 but I'm going to divide that by three because the landlord will receive a benefit that—of the repainting. So that amount is $1,140. $795 for the cost of cleaning. $180 for the plumbing. And $3,651 for the repairs to the drapes.

In addition, the rent July 1st to the 15th, $600. July 16th to the 31st, $1,200. July 1st to—August 1st to the 13th, $960. For total of $2760 for rent.

I am going to award also attorney's fees and costs as indicated.

Miss Morisako and Mr. Santana, if you feel that Mr. Ogata is responsible you have a right to file any claims against him to collect any part of the damages. That's up to you to do.

MR. SANTANA: That's up to me?

THE COURT: Well both of you, if you feel that Mr.—

MR. SANTANA: But I'll pay for his mess? What you saying?

THE COURT: Mr. Ogata—if you feel Mr. Ogata is responsible I'm going to find that you can file any kind of claim against him. You can file a claim against Mr. Ogata for any damages you feel that he is responsible for. And that's up to you.

. . . .

MR. SANTANA: [Ogata] no need pay nothing.

THE COURT: Unless you folks file against him.

MS. MORISAKO: But isn't the agreement between them and him?

THE COURT: Miss Morisako, you folks entered, you didn't sign the inventory, you didn't do the walk-through with them.

**Access.** (a) The tenant shall not unreasonably withhold the tenant's consent to the landlord to enter into the dwelling unit in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply services as agreed; or exhibit the dwelling unit to prospective purchasers, mortgagees, or tenants.

(b) The landlord shall not abuse this right of access nor use it to harass the tenant. Except in case of emergency or where impracticable to do so, the landlord shall give the tenant at least two days notice of the landlord's intent to enter and shall enter only during reasonable hours.

(c) The landlord shall have no other right of entry, except by court order, unless the tenant appears to have abandoned the premises, or as permitted by section 521–70(b).

HRS § 521–70(b) (1993) provides as follows:

**Landlord's remedies for absence, misuse, abandonment and failure to honor tenancy before occupancy.** . . . .

(b) The landlord may, during any extended absence of the tenant, enter the dwelling unit as reasonably necessary for purposes of inspection, maintenance, and safe-keeping or for the purposes permitted by section 521–53(a).

And if you feel, as I said, that he is responsible for part of this, you have a right to file a claim against Sterling Ogata for the damages. Or part of the damages. Well obviously not for rent that you owe.

MS. MORISAKO: So this is happening because he's not present today?

THE COURT: No. It's because you were the tenants. And you are responsible for it.

MR. SANTANA: We're the tenants from May, though. All the times was before.

MS. MORISAKO: We're trying to understand that. So he's not being held responsible for anything up until that point?

THE COURT: Well you didn't do the walk-through and all we have is at—

MR. SANTANA:—15 minutes? They come ride up, 15 minutes, I like do one walk-through? They supposed to give us notice. They didn't give us no notice.

MS. MORISAKO: He did a walk-through on the 11th.

THE COURT: Listen, this was a hearing on damages and that's what the Court is going to find.

MS. MORISAKO: Yeah, but to the wrong people you guys trying to make pay.

THE COURT: If you feel Mr. Ogata is responsible, you file a claim against him.

MS. MORISAKO: Oh, you killing me. Okay, I heard it. Understood. What a trip. You guys went after the wrong people. Mean.

On September 2, 2004, the district court [10] entered judgment in favor of the Sasakis and against Appellants only, for a total amount of $11,647.48. On September 29, 2004, Appellants filed a notice of appeal from the September 2, 2004 judgment. On March 14, 2005 and again on August 31, 2005, the Hawai'i Supreme Court entered an order dismissing appeal, ruling that the appeal was premature because the judgment against Appellants did not resolve the claims against Ogata and the judgment was not final.

On November 10, 2005, the district court entered an amended judgment against Appellants that reflected the dismissal of the Sasakis' claims against Ogata. This appeal followed.

## ISSUES ON APPEAL

Appellants argue on appeal that: (1) they are not liable for the rent claimed and the district court failed to address their claims for wrongful eviction; (2) the amount of damages to the property awarded by the district court was inconsistent with the evidence, as was the entry of the amended judgment against Appellants, because it was Ogata who was the party responsible for the damages that occurred; (3) the amount awarded by the district court for damages to the drapes and for the cost of repainting was "outrageous[;]" and (4) the reason Ogata was not held responsible for his actions is due to his not being officially served with the complaint, even though Ogata was present in the courtroom on August 3, 2004 for another case and the Sasakis' attorney was made aware of Ogata's presence.

## DISCUSSION

### A. *The Award for Unpaid Rent*

The district court ordered Appellants to pay the Sasakis unpaid rent of: (1) $600.00 for the period from July 1 to 15, 2004; (2) $1,200.00 for the period from July 16 to 31, 2004; and (3) $960.00 for the period from August 1 to 13, 2004, for a total of $2,760.00. Appellants contend on appeal that they should not be held liable for this amount because their oral rental agreement with the Sasakis was terminated illegally "[f]or no reason[.]"

The record clearly indicates that although Appellants paid rent for the month of June 2004, they did not pay any rent for the month of July 2004 or for the thirteen days in August 2004 that they occupied the property. By a letter dated July 8, 2004, Appellants were specifically notified that their July 2004 rent in the amount of $1,200.00 was late and if they did not make payment in full on or

---

**10.** Judge Takase presided.

**308**

before the close of business on July 15, 2004, their rental agreement would be terminated as of that date. When Appellants failed to make the requisite payment by the deadline, their oral agreement with the Sasakis was thereby terminated and Appellants became holdover tenants of the property.

Pursuant to Hawaii Revised Statutes (HRS) § 521–71(e) (Supp.2005),[11] which is part of HRS chapter 521, the Landlord–Tenant Code, the damages payable by a holdover tenant are calculated as follows:

(e) Whenever the term of the rental agreement expires, whether by passage of time, by mutual agreement, by the giving of notice as provided in subsection (a), (b), (c), or (d) or by the exercise by the landlord of a right to terminate given under this chapter, if the tenant continues in possession after the date of termination without the landlord's consent, *the tenant may-be liable to the landlord for a sum not to exceed twice the monthly rent under the previous rental agreement, computed and prorated on a daily basis, for each day the tenant remains in possession.* The landlord may bring a summary proceeding for recovery of the possession of the dwelling unit at any time during the first sixty days of holdover. Should the landlord fail to commence summary possession proceedings within the first sixty days of the holdover, in the absence of a rental agreement, a month-to-month tenancy at the monthly rent stipulated in the previous rental agreement shall prevail beginning at the end of the first sixty days of holdover.

(Emphasis added.)

■ The district court's award of unpaid rent damages to the Sasakis for the period of time that Appellants continued to occupy the property after the July 15, 2004 termination date for the oral rental agreement complied with the foregoing statute. Therefore, Appellants' claim that the award for unpaid rent is illegal is meritless.

**B.** *The Award for Damages to the Property*

The written rental agreement between the Sasakis and Ogata was not offered into evidence, and Ernest testified he could not locate it. HRS § 521–37 (1993), which is part of the Landlord–Tenant Code, provides in relevant part, as follows:

**Subleases and assignments.** (a) Unless otherwise agreed to in a written rental agreement and except as otherwise provided in this section, the tenant may sublet the tenant's dwelling unit or assign the rental agreement to another without the landlord's consent.

. . . .

(c) A written rental agreement may provide that the tenant's right to sublet the tenant's dwelling unit or assign the rental agreement is subject to the consent of the landlord.

Morisako claimed below that she moved onto the property at Ogata's invitation after Ogata had vacated the property, thus raising the issue of whether Ogata had sublet or assigned to Morisako his rental agreement with the Sasakis. The Sasakis' complaint against Defendants, however, sought summary possession and damages pursuant to an "oral agreement" for rental of the property and not pursuant to the Sasakis' written rental agreement with Ogata. Therefore, the Sasakis treated their oral landlord-tenant relationship with Appellants as separate from their written landlord-tenant relationship with Ogata.

The district court specifically found "that there was a verbal agreement between Mr. Santana, Miss Morisako, and the Sasakis to rent their property." The district court held that Appellants were responsible for all damages to the property that existed at the termination of their verbal agreement, even those that may have been caused by Ogata, "because [they] were the tenants. And [they were] responsible for it." The district court also informed Appellants that if they wished, they could file a lawsuit against Ogata to recover the damages caused by Ogata. The

**11.** The text of HRS § 521–71(e) (Supp.2005) is the same as it was when the proceedings below occurred.

district court thus placed the burden on Appellants to establish that they were *not* responsible for any damages existent at the termination of their verbal agreement.

The Landlord–Tenant Code provides, in pertinent part, however, as follows:

> Prior to the initial date of initial occupancy, the landlord shall inventory the premises and make a written record detailing the condition of the premises and any furnishings or appliances provided. Duplicate copies of this inventory shall be signed by the landlord and by the tenant and a copy given to each tenant. In an action arising under this section, the executed copy of the inventory shall be presumed to be correct. *If the landlord fails to make such an inventory and written record, the condition of the premises and any furnishings or appliances provided, upon the termination of the tenancy shall be rebuttably presumed to be the same as when the tenant first occupied the premises.*

HRS § 521–42(a) (1993) (emphasis added). The legislative history of House Bill No. 2130–76, which was enacted into law as Act 90, 1976 Haw. Sess. L. 139 and codified as HRS § 521–42(a), explains the legislative purpose for the foregoing provision as follows:

> This bill requires that prior to the initial date of occupancy, the landlord shall inventory the premises and any furnishings or appliances provided. This amendment is intended to protect both the landlord and tenant from false, inaccurate, or misleading claims regarding the condition of the premises at the commencement of the tenancy.

Senate Stand. Comm. Rep. No. 510–76, 1976 Senate Journal 1102.

■ In this case, the Sasakis failed to present the required inventory documenting the condition of the property at the time they accepted payment for the June 2004 rent and entered into the oral rental agreement with Appellants that formed the basis for the Sasakis' complaint. Pursuant to HRS § 521–42(a), therefore, the condition of the property at the termination of the oral rental agreement was presumed to be the same as when Appellants first occupied the property pursuant to the oral agreement.

Since no evidence to rebut the presumption was offered by the Sasakis, the district court's award to the Sasakis for damages to the property was improper.

## CONCLUSION

Based on the foregoing discussion, we reverse that part of the amended judgment, entered on November 10, 2005, that awarded the Sasakis $7,753.08 for damages to the property. In all other respects, the amended judgment is affirmed.

In light of this conclusion, we find it unnecessary to address Appellants' argument that the amount of the damages award was "outrageous" or that the award was the result of the failure by the Sasakis to serve Ogata with the complaint.